**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Interactive Health Solutions, Inc. *et al* [1]<br><br>Debtors. | Chapter 7<br><br>Case No. 20-11526 (BLS)<br><br>(Jointly Administered)<br><br>**Hearing Date: March 3, 2021 at 9:30 a.m.**<br>**Objection Date: February 24, 2021 at 4:00 p.m.** |

**MOTION OF CHAPTER 7 TRUSTEE FOR APPROVAL OF CASH COLLATERAL, SHARING AND REIMBURSEMENT AGREEMENT BETWEEN CHAPTER 7 TRUSTEE AND BANK OF MONTREAL, AS FIRST LIEN ADMINISTRATIVE AGENT FOR PRE-PETITION FIRST LIEN LENDERS, PROVIDING FOR (I) DETERMINATION AND ALLOWANCE OF THE PRE-PETITION FIRST LIEN LENDERS' PRE-PETITION CLAIMS AND LIENS; (II) THE TRUSTEE'S SALE OF THE DEBTORS' ASSETS AND PRE-PETITION FIRST LIEN LENDERS' COLLATERAL; (III) THE TRUSTEE'S USE OF THE PRE-PETITION FIRST LIEN LENDERS' CASH COLLATERAL; (IV) THE SPECIFIED CARVE-OUT OF THE LENDERS' LIENS; AND (V) OTHER MATTERS CONCERNING THE TRUSTEE'S CONTEMPLATED SALE(S) OF COLLATERAL**

George L. Miller, in his capacity as the chapter 7 trustee (the "Trustee") of the estates (the "Estates") of the above-captioned debtors (collectively, the "Debtors"), respectfully requests the entry of an order approving the Cash Collateral, Sharing and Reimbursement Agreement Between Chapter 7 Trustee and Bank of Montreal ("BMO" or the "First Lien Administrative Agent"), as First Lien Administrative Agent for Pre-Petition First Lien Lenders, Providing for (I) Determination and Allowance of the Pre-Petition First Lien Lenders' Pre-Petition Claims and Liens; (II) the Trustee's Sale of the Debtors' Assets and Pre-Petition First Lien Lenders'

---

[1] The debtors in the above-captioned chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Interactive Health Solutions, Inc. ("IHS") (8756); Interactive Health Holdings Corp. ("IH Holdings") (4913); IHS Intermediate, Inc. ("IHS Intermediate") (4172); Interactive Health New York, LLC ("IHNY") (2261); Health Solutions, Inc. ("Health Solutions") (0944); and Health Solutions Services, Inc. ("Health Services") (0325). The address of the first four Debtors is 1700 East Golf Road, Suite 900 Schaumburg, Illinois 60173 while the address of the last two Debtors is 11409 Cronhill Drive, Suite K-R, Owings Mills, Maryland 21117.

Collateral; (III) the Trustee's Use of the Pre-Petition First Lien Lenders' Cash Collateral; (IV) the Specified Carve-Out of the Lenders' Liens; and (V) Other Matters Concerning the Trustee's Contemplated Sale(s) of Collateral (the "Sharing Agreement")[2], a copy of which is attached hereto and incorporated herein as Exhibit "A", and authorizing the Trustee to implement the Sharing Agreement.  In support hereof, the Trustee respectfully states the following:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. § 1409.

## BACKGROUND

2. On June 14, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition in the Bankruptcy Court for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-captioned bankruptcy cases (the "Bankruptcy Cases").

3. On or around the Petition Date, the Trustee was appointed the interim trustee of the Estates.  He has since qualified and is currently serving as permanent trustee of the Estates.

4. On or about August 12, 2020, the Debtors filed their Schedules of Assets and Liabilities, Statements of Financial Affairs, and Global Notes regarding such Schedules and Statements of Financial Affairs (collectively, the "Schedules").

---

[2] Capitalized terms used herein shall have the meanings ascribed in the Sharing Agreement unless otherwise defined.

5.     As of the Petition Date, IH Holdings is the 100% direct owner of IHS Intermediate, which is, in turn, the 100% direct owner of IHS, which is the 100% direct owner of each of Health Solutions, Health Services and IHNY.

## Existing Debt

6.     All of the Debtors are borrowers and/or guarantors under two different secured credit facilities and, according to the Schedules, have total outstanding secured debt under these facilities of approximately $175 million as of the Petition Date. The two facilities are described below.

## First Lien Facility with Prepetition First Lien Lenders

7.     Pursuant to that certain First Lien Credit Agreement dated as of July 20, 2015, as amended by that certain First Amendment to First Lien Credit Agreement dated as of June 8, 2016, as further amended by that certain Second Amendment to First Lien Credit Agreement dated as of April 15, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition First Lien Credit Agreement") by and among BMO, as administrative agent, the Lenders from time to time party thereto (the "Pre-Petition First Lien Lenders"), IHS Intermediate, as Borrower, and IH Holdings, IHS, IHNY, Health Solutions, and Health Services, as joint and several Guarantors, the Lenders provided a first lien credit facility to the Debtors (the "Pre-Petition Obligors").

8.     BMO asserts that as of the Petition Date, the Debtors jointly and severally owed the Pre-Petition First Lien Lenders not less than $116,434,795.06, plus interest, fees, costs and expenses (the "Pre-Petition First Lien Obligations"), consisting of $106,848,200.00 in principal amount of term loans, $2,483,525.63 in interest on such term loans, $7,000,000.00 in principal amount of revolving loans, $79,597.21 in interest on such revolving loans and $23,472.22 in

fees. The Pre-Petition First Lien Obligations are asserted in the various proofs of claim filed by BMO in the Bankruptcy Cases and are listed on the Debtors' Schedules. In addition, copies of BMO's loan and perfection documents relating to the First Lien Credit Agreement have also been shared with the Trustee's counsel.

9. To induce BMO and the Pre-Petition First Lien Lenders to extend the loans evidenced by the Pre-Petition First Lien Credit Agreement, the Pre-Petition Obligors executed that certain First Lien Pledge and Security Agreement, dated as of July 20, 2015 (the "Pre-Petition First Lien Security Agreement") and granted to the First Lien Administrative Agent, for the benefit of the Pre-Petition First Lien Lenders, security interests and liens (the "Pre-Petition First Liens") in substantially all of the Pre-Petition Obligors' assets identified in Section 2 of the Pre-Petition First Lien Security Agreement, including all accounts, all chattel paper, all commercial tort claims identified in Schedule VIII thereto, all deposit accounts, all documents, all general intangibles (including Intellectual Property and Licenses), all goods (including inventory, equipment and fixtures), all instruments, all investment property, all letter of credit rights, all money, all insurance and all insurance claims, all supporting obligations, all other tangible and intangible personal property of the Pre-Petition Obligors, and any and all proceeds of insurance and all causes of action, claims, warranties, products and proceeds arising from or relating to any of the foregoing, including Proceeds (as defined in the Pre-Petition First Lien Security Agreement) whether such Proceeds arise prior to, on or after the Petition Date (collectively, the "Collateral"). For the avoidance of doubt, the Collateral excludes claims and causes of action arising under chapter 5 of the Bankruptcy Code and proceeds thereof ("Avoidance Actions"), and the Collateral includes, *inter alia*, the Debtors' federal tax refund for the 2019 tax year.

10. For all purposes under the Sharing Agreement and any order approving the Sharing Agreement, all Collateral that is listed on the Debtors' Schedules as of the date of the Sharing Agreement excluding all Cash on Hand (as defined in the Sharing Agreement and below), together with all of the Debtors' customer lists and other customer information whether or not explicitly listed on the Debtors' Schedules as of the date of the Sharing Agreement, is referred to as "Scheduled Collateral," and all Collateral that is not listed on the Debtors' Schedules as of the date of the Sharing Agreement excluding all Cash on Hand and excluding the Debtors' customer lists and other customer information, whether or not, in each case, explicitly listed on the Debtors' Schedules as of the date of the Sharing Agreement, is referred to as "Unscheduled Collateral."

11. The Pre-Petition First Lien Credit Agreement, the Pre-Petition First Lien Security Agreement, and any and all other agreements, documents and instruments executed in connection therewith and/or in furtherance thereof, including the Loan Documents as defined in the Pre-Petition First Lien Credit Agreement, are referred to in the Sharing Agreement and hereinafter as the "Pre-Petition First Lien Financing Documents."

**Second Lien Facility with Prepetition Second Lien Lenders**

12. The Trustee states upon information and belief that the Pre-Petition Obligors are party to that certain Second Lien Credit Agreement dated as of July 20, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition Second Lien Credit Agreement"), among the Pre-Petition Obligors, Solar Capital Ltd., as agent (the "Second Lien Administrative Agent") and the Lenders party thereto (the "Pre-Petition Second Lien Lenders"), together with a Second Lien Pledge and Security Agreement among the same parties as of the same date (the "Pre-Petition Second Lien Security Agreement") and various other Loan

5

Documents (as defined in the Pre-Petition Second Lien Credit Agreement). The obligations owed to the Pre-Petition Second Lien Administrative Agent and the Pre-Petition Second Lien Lenders are pursuant to the Pre-Petition Second Lien Credit Agreement are referred to in the Sharing Agreement and herein as the "Pre-Petition Second Lien Obligations". The Pre-Petition Second Lien Credit Agreement, the Pre-Petition Second Lien Security Agreement, and any and all other agreements, documents and instruments executed in connection therewith and/or in furtherance thereof, including the Loan Documents as defined in the Pre-Petition Second Lien Credit Agreement, are referred to hereinafter as the "Pre-Petition Second Lien Financing Documents."

13. According to the Debtors' Schedules, as of the Petition Date the Pre-Petition Obligors owed the Pre-Petition Second Lien Lenders $68,009,057.40.

14. Each of the Debtors, Second Lien Administrative Agent and First Lien Administrative Agent are parties to that certain Intercreditor Agreement dated as of July 20, 2015 (as amended, supplemented or modified from time to time, the "Intercreditor Agreement"), which provides, *inter alia*, that (a) the Second Lien Administrative Agent is not to have a lien on any collateral on which the First Lien Administrative Agent does not have a lien, (b) the liens of the First Lien Administrative Agent are senior and prior to the liens of the Second Lien Administrative Agent, (c) any proceeds of collateral after the occurrence and during the continuation of an Event of Default are to be first applied to the First Lien Pre-Petition First Lien Obligations prior to the Pre-Petition Second Lien Obligations and (d) any cash collateral use and any carve-out consented to by First Lien Administrative Agent shall not be objected to or contested by Second Lien Administrative Agent, and each "Second Lien Claimholder" (as defined therein) shall be deemed to have consented to such cash collateral use and carve-out.

**Trustee's Need for Use of Cash Collateral to Fund Asset Sales**

15.     The Trustee requires the ability to use cash and the proceeds of the Debtors' existing accounts receivable to preserve the value of the Debtors' assets and to fund the orderly liquidation of the Debtors' assets.  These essential items, however, constitute part of the Collateral of BMO and the Pre-Petition First Lien Lenders (the "Cash Collateral") and, therefore, may not be used absent compliance with section 363(c)(2) of the Bankruptcy Code.

16.     BMO and the Pre-Petition First Lien Lenders have consented to the Trustee's use of Cash Collateral (other than the Cash on Hand) to preserve, maintain and liquidate the Collateral as set forth in the Sharing Agreement.  Because such use is essential to the preservation and liquidation of the Debtors' estates, the Trustee submits that the Court should approve the Trustee's use of such Cash Collateral (other than Cash on Hand) under section 363(c)(2) of the Bankruptcy Code.

17.     BMO and the Pre-Petition First Lien Lenders are desirous of the Trustee recovering, preserving, marketing and selling the Collateral pursuant to sales to be conducted under section 363 of the Bankruptcy Code, or, other methods of liquidating and/or recovering Collateral (collectively, the "Asset Sales"), in a manner that is designed and intended to obtain the highest and best price for the Collateral.  The Trustee is willing to conduct the Asset Sales, provided he can pay for the costs of the Asset Sales (including the costs related to recovering, preserving, marketing and selling the Collateral from the proceeds of same) from Cash Collateral, and the Asset Sales will provide some guaranteed benefit to the Estates.

18.     Through the Sharing Agreement, the Trustee and BMO have memorialized their agreements and understandings to allow the Trustee to sell the Collateral to the highest and best bidder(s), to ensure that the Trustee and the Estates can pay the costs of disposing of the

Collateral by using the Collateral and the proceeds of the Collateral, to provide a clear benefit to the Estates for liquidating the Collateral by way of a limited voluntary carve-out of the Collateral by BMO and the Pre-Petition First Lien Lenders, and to fix and determine the extent, validity and priority of the Pre-Petition First Lien Obligations owing to BMO and the Pre-Petition First Lien Lenders and the Pre-Petition First Liens of BMO, for the benefit of the Pre-Petition First Lien Lenders, in the Collateral.

19. In exchange for the Trustee's use of the Collateral, including Cash Collateral other than the Cash on Hand, and the Carve-Out[3], BMO and the Pre-Petition First Lien Lenders are entitled to receive adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for diminution of their interest in the Pre-Petition Collateral (including Cash Collateral) resulting from the Trustee's use of such Collateral and the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value"). For the sake of clarity, the Trustee, BMO and the Pre-Petition First Lien Lenders have agreed that BMO's Diminution in Value claim shall be the amount equal, dollar-for-dollar, to the amount of the administrative expenses paid by the Trustee or the Debtors from the proceeds of Collateral.

20. The Trustee proposes to provide BMO and the Pre-Petition First Lien Lenders with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code. To that end, the Trustee and BMO have negotiated, and the Trustee requests the Court approve, as of the Petition Date, certain protections of the interests of BMO and the Pre-Petition First Lien Lenders in the Collateral from any Diminution in Value of its interest in the Collateral. Such adequate protection shall be in the form of an administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code as more fully set forth below.

---

[3] "Carve-Out" shall collectively mean and include Professional Carve-Out (hereinafter defined) and Estate Carve-Out (hereinafter defined).

21.     The principal terms of the Sharing Agreement, *inter alia*, include the following:[4]

    a.     The Trustee stipulates and agrees that as of the Petition Date, pursuant to the Pre-Petition First Lien Financing Documents, each of the Debtors are jointly and severally indebted to BMO and the Pre-Petition First Lien Lenders in the aggregate amount of $116,434,795.06, and such claims are hereby allowed, and not subject to any challenge, as secured claims (secured by the Collateral) to the extent of the value of the Collateral and as general unsecured deficiency claims to the extent such claims exceed the value of the Collateral (the "Allowed Claims"). *See* Sharing Agreement, ¶ 1.

    b.     The Trustee further stipulates and agrees that the obligations under the Pre-Petition First Lien Financing Documents are secured by first priority liens and security interests granted by the Debtors to BMO, for the benefit of the Pre-Petition First Lien Lenders, in the Collateral. To the extent that there is any disagreement between the Trustee, on the one hand, and BMO or the Pre-Petition First Lien Lenders, on the other hand, as to whether any claims or causes of action or other assets of the Debtors' estates constitute Collateral or not, BMO and the Pre-Petition First Lien Lenders reserve all rights to assert liens against such claims and causes of action, and the Trustee reserves all rights to challenge such asserted liens. *See* Sharing Agreement, ¶ 2.

    c.     Upon Bankruptcy Court approval of the Sharing Agreement, BMO shall be entitled to, and shall be granted relief from the automatic stay to permit BMO to, withdraw all cash then held in the Debtors' deposit accounts at BMO Harris Bank, N.A. (the "BMO Accounts," and such cash as of the date of the Sharing Agreement, the "Cash on Hand"), apply such Cash on Hand on a final basis not subject to challenge or disgorgement and without any charge or deduction by the Trustee or the Estates for any reason, to the Pre-Petition First Lien Obligations in accordance with the Pre-Petition First Lien Financing Documents, and to then close the BMO Accounts. Promptly following Bankruptcy Court approval of the Sharing Agreement, BMO shall provide the Trustee with an accounting of all receipts and deposits in and disbursements from the BMO Accounts from and after the Petition Date through the date of the Sharing Agreement, which accounting shall identify the source, amount and date of any such receipts and deposits, and which accounting shall, with respect to any such disbursements, identify the payee, disbursement amount, purpose of disbursement (to the extent known) and date of disbursement. Promptly following the closure of the BMO Accounts, BMO shall deliver to the Trustee bank account statement for the BMO Accounts showing zero

---

[4] The terms of the Sharing Agreement control to the extent that any conflict with this summary.

balance for such BMO Accounts and evidencing the closure of the BMO Accounts.  *See* Sharing Agreement, ¶ 3.

d. The Trustee will work with BMO in good faith to agree upon a sale process and, where appropriate, bidding procedures for the Asset Sales that both parties believe will lead to the sale of the Collateral at the best possible price.  If the parties cannot agree on the sale process and/or bidding procedures after good faith efforts to meet, confer and agree upon such procedures, the Trustee shall proceed in the manner he deems appropriate and BMO and the Pre-Petition First Lien Lenders shall reserve any and all rights to object to the process proposed by the Trustee.  *See* Sharing Agreement, ¶ 5.

e. BMO expressly agrees, on behalf of the Pre-Petition First Lien Lenders, that the lien and security interests of BMO in the Collateral other than the Cash on Hand shall be subject to a carve-out for the payment of allowed statutory commissions of the Trustee, the professional fees and disbursements incurred by the professionals retained by the Trustee pursuant to Bankruptcy Code § 327 relating to the Asset Sales including the fees related to recovering, preserving, marketing and selling the Collateral (any other activities of the Trustee and his professionals which are not related to the Asset Sales or recovery shall not be subject to the Professional Carve-Out), as may be allowed and awarded by the Bankruptcy Court pursuant to Bankruptcy Code §§ 330 and 331, and the other costs and expenses directly related to the Asset Sales (the "Professional Carve-Out").  BMO agrees and consents to the use by the Trustee of Cash Collateral (other than the Cash on Hand) to pay the Professional Fee Carve-Out.  Notwithstanding BMO's and the Pre-Petition First Lien Lenders' consent to use of the Cash Collateral (other than the Cash on Hand) for the Professional Carve-Out, BMO and the Pre-Petition First Lien Lenders reserve their rights to review and object to the amounts sought as part of the Professional Carve-Out in the normal course.  The Trustee's professionals shall track their time so that the Professionals Carve-Out can be determined.  *See* Sharing Agreement, ¶ 6.

f. BMO further expressly agrees, on behalf of the Pre-Petition First Lien Lenders, that the liens and security interest of BMO shall be subject to an additional carve-out equal to: (a) with respect to the proceeds of Scheduled Collateral, a total of $300,000, plus (b) with respect to the proceeds of Unscheduled Collateral, twenty percent (20%) of up to $4,000,000 of Net[5] proceeds of Unscheduled Collateral, ten percent (10%) of the next $3,000,000 of Net proceeds of Unscheduled Collateral, and five percent (5%) of the Net proceeds of Unscheduled Collateral in excess

---

[5] As used herein, with respect to the proceeds of a given Asset, "Net" shall mean net of the Trustee's statutory fee and the Trustee's allowed professional expenses directly related to recovering, preserving, marketing, selling and liquidating such Asset.

10

of $7,000,000 ((a) and (b), collectively, the "Estate Carve-Out"). The Estate Carve-Out shall be deemed unencumbered assets of the Debtors' estates and shall be distributed by the Trustee in accordance with the order of priorities set forth in Bankruptcy Code § 726, and BMO and the Pre-Petition First Lien Lenders shall be entitled to share in distribution by the Trustee or the Debtors' estates (including any distribution of the Estate Carve-Out and of any proceeds of unencumbered assets, including Avoidance Actions) on account of their Deficiency Claim (as defined in the Sharing Agreement and below) provided however that BMO and the Pre-Petition First Lien Lenders shall not share in any distribution of the Estate Carve-Out on account of their Adequate Protection Priority Administrative Claim. *See* Sharing Agreement, ¶ 7.

g.    BMO will be paid by the Trustee within fifteen (15) business days of the Trustee's receipt of proceeds at any closing on the Asset Sales an amount equal to the gross proceeds of the Asset Sales less the Professionals Carve-Out and Estate Carve-Out, in full and final satisfaction of their liens and security interest against the Collateral being sold, and the Collateral will be transferred to the winning bidder(s) free and clear of the lien and security interest of BMO (the "Immediate BMO Payment") provided that the Immediate BMO Payment from the subject Asset Sale is calculated to be in an amount in excess of $50,000. In the event the Immediate BMO Payment from an Asset Sale is less than $50,000 then the Trustee will pay BMO the Immediate BMO Payment related to such Asset Sale within fifteen (15) business days of the end of the calendar month in which the Asset Sale occurred. To the extent that the obligations to BMO and the Pre-Petition First Lien Lenders under the Pre-Petition First Lien Financing Documents exceed BMO's recovery from the Asset Sales of the Collateral, BMO and the Pre-Petition First Lien Lenders shall have an allowed, general unsecured claim against the estate for the amount of such deficiency (the "Deficiency Claim"). Within twenty (20) days after a request by the Trustee following any payment to BMO from its Collateral, BMO shall provide the Trustee with an updated accounting of the amount of the unpaid balance of the Allowed Claims including the balance of the Deficiency Claim. *See* Sharing Agreement, ¶ 8.

h.    For purposes of the Immediate BMO Payment, the Professionals Carve-Out shall be equal to the Professionals Carve-Out estimated by the Trustee (the "Estimated Professionals Carve-Out"). To the extent that any amount of the Estimated Professionals Carve-Out for Trustee's commissions, or, fees for professionals employed under §327 of the Bankruptcy Code is not awarded by the Bankruptcy Court pursuant to § 330 and/or §331 of the Bankruptcy Code, such amount shall be paid to BMO upon entry of the Bankruptcy Court's final order disallowing such commissions and/or fees. *See* Sharing Agreement, ¶ 9.

11

i. BMO and the Pre-Petition First Lien Lenders shall be deemed pre-qualified bidders with respect to any auction sale or competitive bidding permitted in the Asset Sales, without the need to qualify or pay any bidding deposit. BMO and the Pre-Petition First Lien Lenders shall be entitled to credit bid their security interest and lien upon the Collateral, provided they pay cash equal to the amount of the Professionals Carve-Out, Estate Carve-Out, and any Bankruptcy Court approved break-up fees or expense reimbursement of any stalking horse bidders related to Asset Sales, if any. *See* Sharing Agreement, ¶ 10.

j. The automatic stay under section 363(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit BMO to receive, collect and apply payments and proceeds in respect of the Collateral in accordance with, and to otherwise implement and comply with, the terms and provisions of the Sharing Agreement and the Loan Documents. *See* Sharing Agreement, ¶ 12.

k. Interest and permitted charges and fees under the Pre-Petition First Lien Financing Documents shall accrue from the Petition Date at a rate and in amounts provided for in the Pre-Petition First Lien Financing Documents but only to the extent that the Asset Sales generate sufficient funds to otherwise satisfy the Professionals Carve-Out, the Estate Carve-Out, and the other obligations under the Pre-Petition First Lien Financing Documents. *See* Sharing Agreement, ¶ 13.

l. Except as otherwise provided in the Pre-Petition First Lien Financing Documents, so long as any obligation to BMO or the Pre-Petition First Lien Lenders shall remain outstanding thereunder, (i) the Trustee shall not, directly or indirectly, create, incur, assume or permit to exist any security interest, encumbrance, lien or other security arrangement of any kind, on or with respect to any of the Collateral, or take any action which would grant or create a lien or security interest in favor of any person in such assets other than to BMO and the Pre-Petition First Lien Lenders, and (ii) there shall not be entered in the Bankruptcy Cases any further order which authorizes, under any section of the Bankruptcy Code, including 11 U.S.C. §§ 105 and 364, the procurement of credit or the incurring of indebtedness secured by a lien or which is entitled to super priority administrative claim status which is, in either case, equal to or superior to that of BMO and the Pre-Petition First Lien Lenders (except with respect to a lien on the Collateral which is senior to the security interests of BMO, if any, as of the Petition Date), unless in each instance (x) BMO and the Pre-Petition First Lien Lenders shall have given their prior written consent thereto (and no such consent shall ever be implied from any other action, inaction or acquiescence by BMO and the Pre-Petition First Lien Lenders) or (y) such other order requires that the

12

Pre-Petition First Lien Obligations be indefeasibly paid in full in cash and discharged contemporaneously with the entry of such order. *See* Sharing Agreement, ¶ 14.

m.    As adequate protection for Diminution in Value and as an inducement to BMO to permit the Trustee's use of the Cash Collateral (other than Cash on Hand) and consent to the Carve-Out as provided in the Sharing Agreement and agreed amongst the parties, BMO, as administrative agent for the benefit of the Pre-Petition First Lien Lenders, shall be granted, pursuant to section 364(c)(1) of the Bankruptcy Code an administrative expense claim with priority in the amount of and to the extent of Diminution in Value over all administrative expenses of a kind specified in section 503(b) of the Bankruptcy Code with the exception of the Trustee's statutory commission and the allowed professional fees and expenses of the Trustee's professionals and the Carve-Out to which the Adequate Protection Priority Administrative Claim shall be subject to and subordinate (the "Adequate Protection Priority Administrative Claim"). *See* Sharing Agreement, ¶¶ T, 15.

n.    Except to the extent of the Carve-Out, no costs or expenses of administration of these chapter 7 cases or any future proceeding that may result therefrom shall be charged against or recovered from the Collateral, BMO or the Pre-Petition First Lien Lenders pursuant to Bankruptcy Code sections 506(c) or 105(a), or any similar principle of law or equity, without the prior written consent of BMO and the Pre-Petition First Lien Lenders, and no such consent shall be implied from any other action, inaction or acquiescence by BMO or the Pre-Petition First Lien Lenders. The Trustee shall not consent or agree to the grant of a post-petition lien on any assets of the Debtors or the Estates to any party without the prior written consent of BMO, and no such consent shall be implied from any other action, inaction or acquiescence by BMO. *See* Sharing Agreement, ¶ 16.

o.    The Trustee and each of the Estates, on its own behalf and on behalf of each of their predecessors, their successors and assigns do not have, are forever barred from bringing and hereby to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of BMO and the Pre-Petition First Lien Lenders and each of their predecessors-in-interest and their respective former, current or future affiliates, subsidiaries, agents, officers, directors, employees, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, shareholders, financial advisors, legal advisors, consultants, accountants, attorneys, and other professionals, of and from any and all claims,

13

demands, liabilities, setoff rights, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof solely with respect to or relating to the Pre-Petition First Lien Obligations and the Pre-Petition First Lien Financing Documents and all the transactions related thereto or thereunder, as applicable (but excluding the obligations of BMO and the Pre-Petition First Lien Lenders under the Sharing Agreement), including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, including any and all Avoidance Actions, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of BMO or the Pre-Petition First Lien Lenders  (the "<u>Lender Releases</u>," and, such released claims or causes of action, the "<u>Lender Released Claims</u>").  *See* Sharing Agreement, ¶ U.

p.     BMO and each of the Pre-Petition First Lien Lenders, on its own behalf and on behalf of each of their predecessors, their successors and assigns do not have, are forever barred from bringing and hereby to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge the Trustee and each of his predecessors-in-interest and respective former, current or future affiliates, subsidiaries, agents, officers, directors, employees, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, shareholders, financial advisors, legal advisors, consultants, accountants, attorneys, and other professionals, of and from any and all claims, demands, liabilities, setoff rights, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof solely with respect to or relating to the Trustee's administration of the Debtors' chapter 7 cases (but excluding the rights of BMO and the Pre-Petition First Lien Lenders against the Debtors and the Debtors' estates under the Pre-Petition First

14

Lien Financing Documents and under the Sharing Agreement, which are hereby excluded from and not subject to such release) (the "<u>Trustee Releases</u>," and, such released claims or causes of action, the "<u>Trustee Released Claims</u>," and, the Trustee Released Claims together with the Lender Released Claims, the "<u>Released Claims</u>"). *See* Sharing Agreement, ¶ V.

## SUMMARY OF RELIEF REQUESTED

22. The Trustee respectfully requests that the Bankruptcy Court enter an Order, substantially in the form attached hereto as Exhibit "B", approving the Sharing Agreement and authorizing the Trustee to take any all actions necessary to implement the Sharing Agreement.

## APPLICABLE AUTHORITY

23. The Bankruptcy Court has the authority to grant the relief requested in this motion pursuant to section 105 of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 9019. Section 105(a) provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."

24. Section 704(a) of the Bankruptcy Code provides that the Trustee shall collect and reduce to money the property of the Estates; however in the absence of the sharing and reimbursement provided in the Sharing Agreement, the Trustee will not have the ability to administer the Estates for the benefit of creditors, including BMO and the Pre-Petition First Lien Lenders. Accordingly, an order approving the Sharing Agreement pursuant to section 105(a) of the Bankruptcy Code should be issued as necessary and appropriate to carry out the provisions of title 11, namely the fulfillment of the Trustee's duties under section 704.

25. The Sharing Agreement constitutes a settlement and allowance of claim amounts and rights to the Collateral, and Rule 9019 of the Federal Rules of Bankruptcy Procedure grants the Bankruptcy Court authority to approve settlements of claims and controversies after notice

and a hearing. The United States Court of Appeals for the Third Circuit has emphasized that "to minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Myers v. Martin (In re Martin)*, 91 F. 3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993)). The approval of compromises and settlements is committed to the sound discretion of the bankruptcy court. *See, e.g., In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

26. Before approving a settlement under Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interests of the estate." *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *Louise's*, 211 B.R. at 801). To reach such a determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement. *Martin*, 91 F.3d at 393. In striking this balance, the court should consider the following factors: (a) the probability of success in the litigation; (b) the complexity, expense and likely duration of the litigation; (c) the possibilities of collecting on any judgment which might be obtained; (d) all other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise; and (e) whether the proposed compromise is fair and equitable to the debtors, their creditor, and other parties in interest. *Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968). *See also Martin*, 91 F.3d at 393.

27. Fundamental to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry*, 390 U.S. at 425. The *TMT* rule does not require the Bankruptcy Court to hold a full evidentiary hearing before a compromise can be approved. Rather, the Bankruptcy Court's obligation is "to canvas the issues and see whether the settlement 'falls below the lowest point in a range of

16

\50482824\2 00601.0823.000/492597.000
01/27/2021

reasonableness.'" 10 COLLIER ON BANKRUPTCY, ¶ 9019.2, 9019-4 (15th ed.) (quoting *In re Drexel Lambert Group, Inc.*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991)).

28. The Sharing Agreement provides for the Trustee's use of Cash Collateral as provided for in section 363(c)(2)(A) of the Bankruptcy Code. BMO has consented to same, subject to the terms and conditions of the Sharing Agreement. 11 U.S.C. § 363(c)(2)(A).

## ANALYSIS

29. The Trustee submits that entering into the Sharing Agreement is in the best interest of the Estates and the Debtors' creditors. The Sharing Agreement would provide the Trustee with funds to preserve, market, and attempt to sell or otherwise liquidate the Collateral. If the Trustee is successful in liquidating the Collateral, a percentage of the proceeds from that liquidation will be available for the cost of administration and possible distribution. Without these funds, the Trustee would not be able to preserve, market, and attempt to sell or otherwise liquidate the Collateral, and the Debtors' unsecured creditors would have no prospect for payment therefrom.

30. From the Trustee's perspective, gaining the ability to use Collateral, including Cash Collateral, subject to the terms and conditions of the Sharing Agreement is critical to his ability to administer the Estates and liquidate the Debtors' assets in an expeditious and prudent manner. The Trustee is satisfied that under the Pre-Petition Financing Documents, the Pre-Petition Obligations constitute legal, valid, binding obligations of the Estates, enforceable in accordance with their terms, and are secured by valid, enforceable, binding, perfected and non-avoidable first-priority liens and security interests granted by the Debtors to BMO upon and in the Collateral. The Sharing Agreement reflects a settlement of the Allowed Claims and rights in the Collateral, and the Trustee believes that such settlement is far preferable to expensive and

\50482824\2 00601.0823.000/492597.000
01/27/2021

time-consuming litigation with BMO and/or a possible inability to use Collateral including Cash Collateral. For these reasons, the Trustee's entry into the Sharing Agreement is well within the reasonable exercise of his business judgment.

31. Based on the foregoing, the Trustee respectfully submits that the Bankruptcy Court should approve the Sharing Agreement as being in the best interests of the Estates, and authorize the Trustee to take any and all actions necessary to implement the Sharing Agreement.

## NOTICE

32. Notice of this Motion, including a copy of the Motion, is being given to: (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for BMO, (iii) the Second Lien Administrative Agent, (iv) all other secured creditors listed on the Debtors' Schedules or having asserted a lien against the Debtors' property; (v) the twenty largest unsecured creditors as identified on the claims docket for each Debtor; and (vi) all parties requesting such notice pursuant to Bankruptcy Rule 2002 as of the date hereof. In light of the nature of the relief requested herein, the Trustee respectfully requests a determination by the Bankruptcy Court that such limited notice as described in this paragraph (the "Notice") is adequate and that no other or further notice need be given.

WHEREFORE, the Trustee respectfully requests that the Bankruptcy Court enter an order substantially in the form attached as Exhibit "B": (i) approving the Sharing Agreement; (ii) authorizing the Trustee to take any and all actions necessary to implement the Sharing Agreement; (iii) approving the adequacy of the Notice described herein; and (iv) granting such further relief as may be appropriate.

Dated: January 27, 2021

COZEN O'CONNOR

*/s/ John T. Carroll, III*

John T. Carroll, III (DE No. 4060)
1201 N. Market Street
Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
jcarroll@cozen.com

Eric L. Scherling, Esq. (*not admitted in DE*)
Cozen O'Connor
One Liberty Place
1650 Market Street
Suite 2800
Philadelphia, PA 19103
Telephone: (215) 665-2042
Facsimile: (215) 701-2081
escherling@cozen.com

*Counsel to the Chapter 7 Trustee,
George L. Miller*